## No. 13,808.

MRS. FLORA B. CAMERON ET ALS. VS. ORLEANS AND JEFFERSON RAILWAY COMPANY, LIMITED.

### SYLLABUS.

1. One who furnishes ties and lumber to a contractor who is building a railroad and who has received payment for the same in accordance with the terms of his contract has no claim against the company for which the road is being built, where he has served no notice and taken no steps to preserve his rights, and his seizure of the material which has been delivered to, and paid for by, such company is unauthorized.

2. Where a contractor undertakes to build and equip a railroad, the mere fact that he has assembled material, suitable, and which he contemplates using for that purpose, gives to the other contracting party no right to control his disposition of such material, and an injunction will not lie to restrain him from removing it elsewhere. Nor, does the fact that the other contracting party has given him information which has led to the obtention of such material make it obligatory upon the contractor to put it into the road or to sell it to the contractee at cost.

3. Where one has furnished material to a contractor, engaged in building a railroad, in the honest belief that he will be protected by reason of the fact that the money to be used is to be drawn upon the joint checks of the contractor and the company for which the road is being built, but it turns out that he is not protected, and the material furnished is in the possession of such company, but legally beyond his reach, and he levies a seizure upon property belonging to the contractor and also sues the company and seizes such material, he is liable in damages to the company, but if it appears that the seizure, as against the contractor, is good and would, of itself, have stopped the work no greater damages will be allowed than are clearly proven.

4. Partnership, no doubt, results from intention, but the question in any given case, is, what is the intention of the parties? If, by their representations, dealings, and conduct, it appears that they have agreed to everything that, as a matter of law, is necessary to constitute a partnership, and that, by reason of the rights which they have secured to, and the obligations which they have imposed upon, themselves, they occupy towards each other the relation of principals, and really share the profits of the business in which they are engaged in that relation, and not as employer and employee, it must follow that the business is theirs, and they are liable for the obligations

incurred for its purposes for that reason, and the disclaimer, in their con
tract, of the intention to enter into the partnership relation, and the asser-
tion, thus contradicted, that they occupy, or intend to occupy, the relation
of employer and employee, are not conclusive as to third persons.

5.  The status of a partnership and the character of the liability of its members
are matters to be determined by the law of the domicile, and where a part
nership, created in another state, does business in Louisiana, are, presum
ably, to be determined by the Law Merchant, of which this court takes judi-
cial notice, as prevailing in this country, save where it is shown to have been
modified by statute.

6.  Where money is borrowed upon a promise to furnish, as collateral security,
bills of lading for property then in the hands of a carrier, and unpaid for,
and the borrower pays for the property and retains the bills in his posses
sion, with the consent of the lender, until the property itself, still in the
hands of the carrier, is seized at the suit of his creditor, the lender has no
pledge, and the subsequent delivery of the bills to him does not affect the
seizure.

7.  Where a contractor agrees to pay for material, half in cash, and half in
bonds, secured by mortgage upon the work on which he is engaged, to be
delivered at their market value, and, receiving and disposing of, the material,
he fails to go on with his contract and thereby give value, and entitle him-
self, to the bonds, the furnisher of material has the right to demand the full
amount due him, in money.

A PPEAL from the civil district court, parish of Orleans—*Théard,*
J.

*McCloskey & Benedict,* for plaintiffs, appellants.

---

*Carroll & Carroll* and *Dinkelspiel & Hart,* for defendant, appellant.

---

*George W. Flynn,* for Costello & Burke, defendants, appellees.

---

*Rouse & Grant,* for the Atlas National Bank, intervenor, appellee.

---

*Hunter C. Leake* and *Gustave Lemle (J. M. Dickinson,* of counsel),
for Illinois Central Railroad Company, defendant and third opponent,
appellee.

---

*E. L. Simonds,* for International Construction Company, defendant,
appellee.

---

The opinion of the court was delivered by

MONROE, J.  Mrs. Flora B. Cameron and others, as executors of the
will of William Cameron, filed suit alleging that the Orleans and Jef-
ferson Railway Company, Limited (which will be called the Orleans

Company), was incorporated for the purpose of building and operating a railroad in the parishes of Orleans and Jefferson, and that it made a contract with the International Construction Company (which will be called the Construction Company), agreeably to which the latter was to build the road; that petitioners sold and delivered to said Construction Company and to said Orleans Company cross-ties, lumber, and other material, for which they were to be paid one-half cash and the balance in the bonds of the Orleans Company at their market value, and that said ties and material had been delivered to, and were in the possession of, said Orleans Company; that the Construction Company was a commercial firm domiciled at Detroit, Michigan, and composed of Charles H. Lawrence, of that city, E. M. Costello and M. D. Burke, of Cincinnati, and other persons, non-resident in this state, and that said company had property within the jurisdiction of the court and under the control of the Orleans Company; and plaintiffs prayed for writs of sequestration and attachment and process of garnishment, and for judgment against the defendants, *in solido,* in the sum of $12,207.38, as the contract price of said ties and material, with privilege upon the property to be seized. Agreeably to the prayer of this petition, a writ of sequestration was issued under which certain ties were seized, and a writ of attachment, under which a quantity of steel rails, loaded on cars in the possession of the Illinois Central Railroad Company, were also seized. And, thereafter, by motions, exceptions, answers, interventions and reconventions, the different parties now before the court set up their various defenses, claims and counter claims, as follows:

The Orleans Company, by way of defense, denies that it made any contract with the plaintiff or that it bound itself to pay for any material which the plaintiff might deliver to the Construction Company and alleges that the Construction Company was to build the road and was to be paid upon estimates to be furnished, from time to time, for work done, and material delivered. It further alleges that the ties in question had been delivered to, and paid for by, it, in accordance with this contract and without notice of plaintiffs' claim, and it prays that plaintiffs' suit be dismissed, and that it recover damages, in reconvention, for the seizure of its property.

By way of intervention, said company alleges that the rails were bought by the Construction Company at the suggestion of one of its (The Orleans Company's) officers for the purposes of the road in

question, and that, inasmuch as they could not be replaced without prejudicial delay, intervenor, though not required so to do by its contract, offered to pay for them, but that the offer was declined by the Construction Company and also by Costello and Burke; that said Construction Company claims to have paid for said rails; that Costello and Burke claim to have paid for them; that the Atlas National Bank, of Cincinnati, claims to have advanced part of the purchase money and to have a privilege and right of pledge on them; and that plaintiffs have seized them under their attachment, but that intervenor is entitled to them upon paying the cost price, and it prays judgment accordingly.

The Orleans Company also filed a separate suit, entitled Orleans & Jefferson Railway Company, Limited, vs. International Construction Company (which appears in this court under the number 13,809), after the attachment had been levied, setting up its claim to the rails and praying that the Construction Company be perpetually enjoined from removing them beyond the jurisdiction of the court, and, as the issues in the two cases are identical up to a certain point, and the transcript in this case is used for the purposes of the other, the cases have been argued together and will be so dealt with in this opinion.

The Construction Company denies that it is a commercial firm composed of the parties named in the petition. It admits that it made a written contract with the plaintiffs for ties, etc., which were to be paid for when delivered, but it denies that the same have been delivered, and alleges that this action is premature, and it prays for damages in reconvention, with reservation of its rights against the Orleans Company, which, it alleges, has failed to comply with its contract.

E. M. Costello and M. D. Burke, for answer to the demand made against them, individually, and as members of the Construction Company, deny that they were members of said company, or were ever connected therewith except as employees, and, assuming the character of plaintiffs in reconvention, they allege that the rails in question were shipped to New Orleans by the Illinois Central Railroad Company to be delivered to the Construction Company when paid for, but that the Construction Company failed to pay for them and delivery was refused; that thereafter appearers bought said rails, and that

$5,200.00 of the money used in paying for them was advanced by the Atlas National Bank, to which bills of lading for all said rails were delivered as security for the money so advanced. They deny that the failure of the Orleans Company, or the Construction Company, to build the road is attributable to them, and they pray that the attachment be dissolved, with damages, and that the rails be surrendered to them subject to the pledge in favor of the Atlas National Bank for its advances.

These parties, that is to say, Costello and Burke, also appear as intervenors and reiterate, generally, the statements made in their answer and demand in reconvention, and further allege, in explanation of their connection with the Construction Company, that, in 1898, they became acquainted with C. H. Lawrence, of Detroit, "who stated that he was the representative and general manager of the International Construction Company" and that he desired to secure their services in carrying out a contract for the construction of a railroad near Cincinnati, but, that said road was not built and they had nothing more to do with Lawrence or his company "until about March 15, 1899," when they received a letter from him in consequence of which they went to Detroit and that he there exhibited to them a contract which had been entered into between the Orleans Company and the Construction Company and informed them that he desired to secure their services in executing the same; that, as a result of their interview, Costello came to New Orleans, about March 19th, for the purpose of investigating, and that, on his return, intervenors agreed to give their services in the contemplated work for one-half of the profits, which were to be paid as a salary, and a further allowance of $25 per week which was to be paid to Costello. That they, thereupon, came to New Orleans and began to work for the Construction Company, and that the plaintiffs and the public generally had full knowledge of the fact that they were employees "by the letter heads and stationery of said company;" that, about June 22nd, they received a letter from Lawrence stating that he had bought some rails from the Illinois Central Railroad Company for which he was unable to pay, and requesting them to pay for the same, and that they, thereupon, "wired" the Orleans Company asking if they would be allowed a lien for the amount which they might advance for that purpose; that the Orleans Company gave an affirmative answer subject to the conditoin

that the assent of the Construction Company, and its surety, and a certificate from "Hunt's Inspection Bureau," be obtained, and that they then "wired the Orleans Company that they had communicated with Lawrence and that if his answer was favorable they would begin laying the track the following week; that, in response to this communication, Lawrence met them in Cincinnati and again requested them to pay for the rails, and that they agreed to buy the rails for their own account, provided Lawrence would transfer to them the contract with the Orleans Company, which they agreed to assume if they found, on returning to New Orleans, that Lawrence had succeeded in raising $60,000.00 in New York, which, by the terms of said contract, he had undertaken to borrow, for the purposes thereof, on the bonds of said company. They further allege that, on, or about, June 26th, the Illinois Central Railroad Company, agreed to accept them as purchasers of the rails in place of the Construction Company and that Lawrence, for said company, assigned to them the contract aforesaid, which was to be accepted by them and presented for approval to the Orleans Company only upon the conditions stated. They further allege that Lawrence did not succeed in borrowing the money necessary to carry out said contract and that they therefore refused to assume the same and that they "now tender said rails to said" (Orleans) "company for the amount paid by them for the same * * * provided said company will pay for same within a reasonable time, say August 15th, 1899." They allege injury resulting from the seizure, and pray judgment decreeing them to be the owners of the rails and awarding them damages.

The Illinois Central Railroad Company intervenes claiming $638.00 for the use of twenty-two cars for twenty-nine days during which they were held loaded with the rails.

The Atlas National Bank intervenes claiming to be pledgee of the rails for the sum of $5,200.00 with interest.

The writ of sequestration was dissolved by the district court, in an interlocutory proceeding, and there was judgment on the merits, rejecting the claim of the plaintiffs as against the Orleans Company and as against Costello and Burke, recognizing the latter as owner of the rails, subject to the claim of the Illinois Central Railroad Company and the Atlas National Bank, and dissolving the attachment, with damages, also condemning the plaintiffs in damages upon the

reconventional demand of the Orleans Company and condemning the Orleans Company in damages upon the reconventional demand (set up in the injunction suit) of Costello and Burke, and in favor of the plaintiffs and against the Construction Company on the main and reconventional demands of those parties, respectively.

## I.

The International Construction Company has no corporate existence but is merely the name under which C. H. Lawrence transacts business, either alone or in connection with other persons, one of the issues in the case being whether Costello and Burke were associated with him as partners in the business out of which this suit arises. Lawrence, in the name of the Construction Company, contracted to build and equip, for the Orleans Company, the road contemplated by its charter, and it was part of his contract that he should borrow the money necessary for that purpose, with the exception of $7,377.00, upon the mortgage bonds of the Orleans Company, a certain proportion of which were to be "underwritten" by several of the officers of the Orleans Company, acting individually. The $7,377.00 mentioned was to be furnished by the Orleans Company, in cash, and, of that amount, $1,000.00 was to be paid at once to the Construction Company and $6,377.00 was to be deposited in bank, together with the money to be borrowed by Lawrence, subject to the joint order of the contracting parties, and paid to the Construction Company, for material delivered and work done upon presentation of bills of lading and engineers estimates. It may as well be stated here that Lawrence did not succeed in borrowing any money, but that some of the members of the Orleans Company advanced $10,000.00, in addition to the cash called for by the original contract, and that the fund so created, together with certain amounts advanced by Costello and Burke, constituted the only fund that was available until the enterprise failed. One Conroy, and T. Gordon Reddy, Jr., representing the plaintiffs, were endeavoring, whilst the negotiations between the Orleans Company and the Construction Company were in progress, to obtain the contract to supply the ties and other lumber needed for the building of the road. Conroy was called off elsewhere and Reddy, the manager of the Cameron Mills, took charge of the matter and had some conversations with the president of the Orleans Company, with Zell,

director, vice-president, and acting treasurer of that company, and who was also the engineer upon whose certificates the money was to be paid, and with Lawrence, representing the Construction Company. He, also, before entering into any contract, made the acquaintance of Costello. The evidence justifies the conclusion that it was originally contemplated, as between the Orleans Company and the Construction Company, that, when money was drawn upon their joint checks, on the presentation of bills of lading, showing the delivery of material, or of engineers estimates, showing work done, such money should be used to pay for the particular material represented by the bills, or the particular work represented by the estimates, so presented, and it can hardly be doubted that Reddy acted under the impression that the payment of the amount to become due under any contract which he might make would, to some extent at least, be secured by reason of the fact that all such payments were to be made by the joint authority of both the parties to the main contract. That contract, however, in terms, provided that, upon presentation of the bills of lading, etc., the money was to be paid, not to the parties furnishing the material, but to the Construction Company, and it was therefore left to that company either to pay for the particular material called for by the bills presented or to use the money so obtained in paying for some other material, or work, and the evidence does not make it clear that any assurances, for which the Orleans Company could be held bound, were given to Reddy that the latter course might not be pursued. The main contract also provided that after the completion of the work, and before receiving the final payment, the Construction Company should present receipted bills for all materials furnished, and it is probable that Reddy relied somewhat upon this stipulation, of which he was informed. As a matter of fact, it does not appear that he ever saw the main contract or asked to see it, and his contract to supply ties, etc., consists of a written proposition, addressed to the "International Construction Company, Detroit, Michigan," and an acceptance thereof by "C. H. Lawrence, contracting agent, International Construction Company, of Detroit, Mich.", the Orleans Company being in no manner a party thereto. It is true that, after the proposition had been forwarded, and after acceptance had been mailed, Reddy wrote a letter to Zell in which he speaks of having submitted a proposition to the Construction Company *and* the Orleans Company, and that Zell

replied, saying, that Lawrence would return in a few days, that all financial matters had been arranged, that Reddy could go on sawing the lumber and would run no risk in shipping it, and that all parties furnishing material would be protected, as the Construction Company would be required to furnish receipted bills within ten days after the completion of the work before it could obtain a final settlement. But this letter was written in his private office, was unauthorized by the Orleans Company, and was not brought to the knowledge of any of its officers until just before the institution of this suit. And as Reddy knew the president of the Orleans Company, and ought to have known that a vice-president is an officer who usually acts only in case of the absence or disability of the president, there appears to us to have been no good reason for his addressing Zell or for his relying upon Zell's assurances. Beyond this, it is claimed that the ties and material were shipped to the Construction Company *and* the Orleans Company, but this claim is not sustained by the evidence, the fact, as we take it, being, that the shipments were made to the Construction Company, alone. Under these circumstances, we are of opinion that the plaintiffs made no contract with the Orleans Company and have no claim against it, and that the sequestration of the ties, which had been delivered to, and paid for by, that company, was properly set aside. We do not think, however, that the Orleans Company is entitled to recover any damage other than so much of its attorney's fees as are fairly attributable to the services rendered in dissolving the sequestration. After the plaintiffs had delivered almost all of the ties and material called for by their contract, they learned from the president of the Orleans Company that the money to pay for the same had been turned over to the Construction Company, and he expressed great surprise that it had not reached the plaintiffs, the fact being that it had been used for some other purpose and that the Construction Company had no means of replacing it. The plaintiffs then determined to bring suit, and whilst the officers of the Orleans Company endeavored to dissuade them from so doing, and, particularly, from suing the Orleans Company, they furnished certain data upon the basis of which the suit against the Construction Company was brought. Even if this were not the case the Orleans Company would have no right to complain of the suit brought against the Construction Company, and we are satisfied that the joining it as a defendant in that suit inflicted

no particular injury that would not have been sustained by the suit against the Construction Company, alone, accompanied, as that suit was, by the seizure of the rails without which no progress could have been made in the building of the road. The ties were never removed from their positions and were not long under seizure. We are, therefore, of the opinion that the amount allowed in damages on the reconventional demand of the Orleans Company should be reduced to $250.00.

### II.

There was judgment in the district court in favor of the plaintiffs and against the International Construction Company for the amount claimed in the petition, but it was held that Costello and Burke were not members of the company, and, as Lawrence was not condemned individually, and as the property which was seized was released, as belonging, either to the Orleans Company, or to Costello and Burke, the judgment, as rendered, can be of no great value to the plaintiffs, and the Construction Company took no appeal therefrom.

### III.

Probably the most serious question presented is whether Costello and Burke were partners of Lawrence for the purposes of the business out of which this litigation has arisen.

The evidence shows that, prior to 1899, C. H. Lawrence, who lived in Detroit, was operating under the name of the International Construction Company, save, when, for the purposes of particular transactions, he associated other persons with him. It also appears that E. M. Costello, of Cincinnati, was operating in the same way under the name of the Queen City Construction Company, and that he, at times, associated M. D. Burke with him, either under that name or under the firm name of Costello & Burke. During the year 1898, these parties, Lawrence, Costello and Burke, using the name of their so-called companies, or otherwise, entered into an arrangement for the building of a railroad, near Cincinnati, known as the Mill Creek Valley Road, but, by reason of the failure to obtain some necessary franchise, the scheme was abandoned. A similar arrangement appears to have been entered into for the building of a road near Erie, Pennsylvania, and, as we understand the testimony, they were engaged upon that work whilst operat-

ing in Louisiana, the proposition which led to their association for the purposes of the work at Erie and of that at New Orleans having been made at the same time. Thus, on February 21st, 1899, Lawrence wrote, from Detroit, to Costello, at Cincinnati, "I have some work which I believe we could take together and make some money. * * * I think both contracts which I have would prove enticing to both yourself and Major Burke." And he invited Costello to visit Detroit in order that they might discuss the matter. After writing this letter, he appears to have come to New Orleans, and, on his return to Detroit, to have found a letter from Costello awaiting him. He, accordingly, wrote Costello again, on March 4th, stating what work he had on hand and repeating the invitation contained in the previous letter. And, on March 6th, Costello and Burke went to Detroit and had an interview with him, as the result of which, on March 7th, he offered them a partnership interest in the New Orleans work, and, as we infer, also made them a similar offer with regard to the work at Erie, Pennsylvania. The proposition as to the New Orleans work was made dependent upon their approval of his contract with the Orleans Company, which had not then been signed, and it contained the following stipulation, to-wit:

"If the foregoing proposition is satisfactory to the Queen City Construction Company, a copy of this communication shall be made by the Queen City Construction Company and indorse across its face "Accepted and approved, Queen City Construction Company, by E. M. Costello and M. D. Burke," and this shall constitute the contract for the Orleans and Jefferson Railway job between the International Construction Company and the Queen City Construction Company."

Judging from this language, and from the subsequent conduct of the parties, we understand the idea to have been that the contract with the Orleans Company should be submitted to Costello and Burke as soon as it was signed, and, if it met with their approval, that they should close the contract of partnership with Lawrence by writing the words "Accepted and approved" across the face of the written proposition which the latter had submitted, or a copy thereof, and affixing their signatures. The contract with the Orleans Company, having been signed upon March 11th, was forwarded to Costello on March 13th, and was, presumably, found satisfactory, since there appears in evidence Lawrence's proposition, in which some slight changes had

been made, in the meanwhile, with the words "Accepted and approved" written across its face and duly signed, in literal compliance with the stipulation above quoted, the instrument still bearing the date, March 7th. By the 15th of March, therefore, the three parties named had entered into partnership by written agreement, for the carrying out of the contract for the construction and equipment of the Orleans and Jefferson Railway. Thereafter, about March 19th, Lawrence and Costello came to New Orleans, and the latter was introduced to Castleman, the president of the Orleans Company, to Grunewald, a director of that company, to Reddy, who shortly afterwards, as the representative of the plaintiffs, made the contract here sued on, and to a number of other persons, as Lawrence's partner, and as a member of the International Construction Company, in the matter of building and equipping the Orleans and Jefferson Railway. The evidence leaves no room for doubt that, when Costello came to New Orleans, on or about March 19th, the question, whether he and Burke and Lawrence would form a partnership, had been settled by a written contract, signed after they had made all the inquiries that they thought proper to make, and the position which Costello and Burke now assume, that Costello came here to make an investigation in order to enable them to determine whether they would form such a partnership, or not, does not accord with the facts, nor, as we shall see, does it accord with their subsequent representations and conduct. They claim that when Costello returned to Cincinnati they had an interview with Lawrence, upon the evening of March 23rd, and entered into a new contract whereby it was stipulated that all former agreements as to the New Orleans work should be considered void, but that they would advance $750 so as to enable Lawrence to go to New York and borrow the money called for by the contract with the Orleans Company, and, if he succeeded in doing so, that they would procure for him the bond of $15,000 in favor of the Orleans Company required by that contract, and would render their services in the capacity of employees in carrying out said contract, and that, in consideration thereof, there were to be delivered to them one-half of the cash and securities that Lawrence might receive, after paying expenses, but that said contract should be executed by, and in the name of, the International Construction Company, and that neither Costello nor Burke nor the firm of Costello & Burke, nor the Queen City Construction Company,

should be authorized, or required, to sign any paper obligating them, or either of them, in any amount, or for any purpose connected therewith; and there is, in the record, an instrument purporting to witness such a contract and to have been signed March 23rd, 1899, by the International Construction Company, the Queen City Construction Company, Lawrence, Costello and Burke. This instrument also contains the stipulation that "a book-keeper or accountant, satisfactory to Costello and Burke shall be placed in charge of the New Orleans office of the International Construction Company and the payment and accounts of the entire venture shall be under the supervision of said accountant and at all times accessible to Costello and Burke." Both Costello and Burke were examined at great length, and they testified, without qualification, that this contract was entered into at the Stag Hotel, in Cincinnati, upon the evening of March 23rd, 1899. The impression conveyed by them in their examination in chief and, for the most part, in their cross-examination, is, that the agreement was completed and signed at the Stag Hotel, as it now appears in evidence, upon March 23rd. Towards the close of the cross-examination, however, Burke was asked the direct question, "When was the instrument signed?", and he replied that it was signed, at his office, on the 1st of April. We think this circumstance is worthy of some attention, because, whilst it may have happened just as the witness states, this is not the only instance in which papers, presumably having an important bearing on the rights of the parties, have been found to bear dates long anterior to their execution. Proceeding to the consideration of subsequent events: Notwithstanding that Lawrence did not succeed in borrowing the money required by and for the contract with the Orleans Company, Costello and Burke procured for him the bond of $15,000.00 to secure the Orleans Company with respect to the execution of that contract, and, in order to do so, gave to the security company furnishing it, a bond of indemnity, signed by themselves, for a like amount, thus placing themselves in a position to bear the losses resulting from the enterprise, even though it was not so stipulated in the Stag Hotel contract. About April 4th, Burke came to New Orleans, and Castleman, calling upon Lawrence at his hotel, found him in Lawrence's room and was introduced to him by Lawrence in the following terms, "Mr. Castleman let me introduce you to Major Burke, a member of our company, and our chief engineer," to which

Burke responded by saying, "Yes," and by further saying, "Now you have seen the entire firm, or the principal members, and it is a good one. Mr. Lawrence is the financier, Mr. Costello is the contractor, and myself the engineer. * * * It is a good firm and we are going to build you a splendid piece of work." Burke remained in New Orleans some ten days or two weeks, and was joined, about April 14th, by Costello. During that time he occupied himself with such engineering work as the situation demanded, and, having supplied himself with the necessary data, returned to Cincinnati to place orders for certain of the material needed. Lawrence, also, went north, and Costello remained here, in charge of the business, until about June 20th. During his stay he represented the International Construction Company in all respects, and, by his language and conduct, at all times, held himself out to be a member of that company. The letter headings, specifically referred to in the pleadings, as informing the public that he and Burke were *not* members of the firm, when considered in connection with the other representations and the conduct of the parties, appear to us to convey the opposite meaning. They read as follows:

"HOME OFFICE,                           NEW ORLEANS,
"*Detroit, Mich.*                        508 *Hennen Building.*
                                           E. M. COSTELLO,
                                                      *Manager.*
"C. H. LAWRENCE,                         M. D. BURKE,
     "*General Contracting Agent.*            *Chief Engineer.*

### "INTERNATIONAL CONSTRUCTION COMPANY.
### "CONTRACTING ENGINEERS."

It is true that Costello and Burke deny, in their testimony, that they made the representations attributed to them, or that they were introduced and held out as has been stated, but their denials are absolutely unsupported by that of any other witness and are overwhelmed by evidence from every direction. One circumstance, among many, which has attracted our attention, is the following: Burke was charged with the ordering of some two carloads of "special work," consisting, as we understand it, of iron, or steel, for switches, curves, frogs, etc., and he placed the order with the "Weir Frog Company,"

a Cincinnati concern with which he seems to have been friendly. He testifies that he dealt directly with Mr. Abby, the engineer of the company, and that he gave the order merely as an employee of the International Construction Company, and not as a member, and that he, in no way, guaranteed the bill or made himself, or the firm of Costello & Burke, liable for it. He also testifies that he is aware of the fact that Abby had testified to the contrary. The testimony of Castleman, Zell, and Clark is to the effect that both Costello and Burke stated that they had made themselves responsible for the special work and had actually paid $1,000.00 on account of it from their individual funds. But a further refutation of Burke's testimony appears over his own signature. It became necessary to raise some $12,000.00 to pay for the rails and the money was obtained by Costello and Burke. In connection with their action in that behalf, they obtained an assignment, from Lawrence, of the contract with the Orleans Company upon the face of which assignment it appeared that Lawrence was entirely eliminated. There was, however, an understanding, which was reduced to writing by Burke in the form of a letter addressed to Lawrence, reading in part, as follows:

"404 Pike Building, Cincinnati, Ohio.

"C. H. Lawrence,
"The International Construction Company,
"Chamber of Commerce Building,
"Detroit, Michigan.

"Dear Sir—

"Costello left for New Orleans yesterday afternoon, and, allowing for a stop over in Birmingham, he will reach New Orleans on Friday morning. A little money was wired to Hall yesterday, to pay laborers and other pressing demands and to signify something more than a mere promise that he was coming. The draft for rails is here paid. It was a close call for us, but we made it. * * * Regarding the agreement between us, there was so much to do before Costello left that it was thought best that I should write you a letter stating the general terms and that you should keep the letter in place of the formal agreement until that should be executed. It is this; that E. M. Costello and M. D. Burke having advanced their money and pledged their credit to secure the rails, special work, car barn, and other property necessary for the building of the Orleans and Jefferson Rail-

way Company * * * that, in consideration of such advances, C. H. Lawrence, for himself and for the International Construction Company, does, on June 24th, 1899, assign all his, or its, interests in said contract to said Costello and Burke, yet, notwithstanding said assignment, said three individuals agree to act unitedly in carrying to completion the original agreement with the Orleans and Jefferson Railway Company, said Costello and Burke agreeing to relieve said Lawrence of so much of the work at New Orleans as they can, and neither individual being empowered, after said date, to pledge any of the securities to be received for the said work or to obligate either of the persons, all to work for the best interests of the three, and, at the completion of the work, the net profit, if any, arising from said contract, to be divided equally between E. M. Costello, M. D. Burke and C. H. Lawrence. This agreement between said three individuals to be kept strictly private, each agreeing with the other two not to use it in any business way without the knowledge and consent of the other two parties to this agreement," etc.

Of course, Lawrence must have known whether Costello and Burke had advanced "their money and pledged their credit to secure the rails, special work, car barn, and other property necessary for the building" of the road. And the statement that they had done so would hardly have been made to him as a reason why he should, ostensibly, assign the contract to them and, really, reduce his interest in the prospective profits from one-half to one-third, unless that statement was true. We must assume, therefore, that it was true, and that the testimony of the witnesses, who swear that the same statement, in substance, was made to them, or in their presence, was equally true.

There is a great deal more testimony and there are a great many more circumstances disclosed by the record bearing upon the point at issue leading to the same conclusion, but which it would unnecessarily lengthen this opinion to consider or even to recapitulate. No one doubts that partnership is a matter of intention, or that a share of profits may be given, in lieu of salary or wages, without making the recipient a partner, or liable as a partner. This latter doctrine was recognized, not only before the decision in Cox vs. Hickman (in 1860), but before, and after, the decisions in Grace vs. Smith and Waugh vs. Carver, which had been rendered nearly a century before,

and which were overruled by Cox vs. Hickman. The question, in any given case, is, *what is the intention of the parties?* If, by their representations, dealings and conduct, it appears that they have agreed to everything that, as a matter of law, is necessary to constitute a partnership, and that, by reason of the rights which they have secured to, and the obligations which they have imposed upon, themselves, they occupy towards each other the relation of principals, and, really, share the profits of the business in which they are engaged in that relation, and not as employers and employees, it must follow that the business is their's, and that they are liable for the obligations incurred for its purposes for that reason, and the disclaimer in their contract of their intention to enter into partnership and the bald assertion, thus contradicted, that they occupy or intend to occupy the relation of employers and employees is not conclusive as to third persons. Upon the facts as presented, we may properly apply to the particular litigants here concerned the following language from the opinion of Sir George Jessel M. R. in a case in which Cox vs. Hickman and other leading English cases involving the law of partnership were exhaustively reviewed, to-wit:

"It was said, and said with considerable force, by Mr. Chitty and Mr. Mathew, that they never intended to be partners. What they did not intend to do was to incur the liabilities of partners. If intending to be a partner is intending to take the profits, then they intended to be partners. If intending to take the profits and have the business carried on for their benefit was intending to be partners, they did intend to be partners. If intending to see that the money was applied for that purpose, and for no other, and to exercise an efficient control over it, so that they might have brought an action to restrain it from being otherwise applied, and so forth; was intending to be partners, then they did intend to be partners. * * * It is an elaborate device, an ingenuous contrivance, for giving these contributors the whole of the advantages of partnership, without subjecting them, as they thought, to any liabilities. I think the device fails; and that, looking at the law as it stands, I must hold that they are partners and liable for the consequences of being partners, and to the whole of the engagements of the partnership, and consequently liable for the whole of its debts."

Pooley vs. Driver, 5 Ch. Div. 458.

## IV.

The contract upon which the plaintiffs sue resulted from a written proposition addressed by Reddy, the manager of the Cameron Mills, to the International Construction Company, dated March 24, 1899, and accepted in writing upon the 29th of the same month. The proposition contained the following stipulation, "Settlement to be made as soon as shipment is completed, on terms as follows; one-half of the entire amount in cash, and balance (less freight as per expense bills) to be paid in first mortgage bonds of said railroad at market value or price of said bonds at time of settlement." The contract called for 100,000 feet of "pecky" cypress, 25,000 ties, and a number of pieces of timber for bridges and other work, and the evidence shows that the whole of it has been delivered, with the exception of 695 ties, the price of which is not claimed. It is shown, however, that six carloads of ties had been shipped prior to the bringing of this suit, and that the defendants had failed to take them, and that Costello had notified Reddy to temporarily discontinue shipments. And it was at this juncture that Reddy, upon making inquiries at the office of the Orleans Company, learned that the ties previously shipped had been estimated for and that the money to pay for them had been turned over to the Construction Company and used for some other purposes. The efforts of Lawrence, to borrow money upon the bonds of the Orleans Company, as he had undertaken to do, had, in the meanwhile, proved unsuccessful; the work of building the road had been suspended, and the evidence justifies the conclusion that the scheme was a failure. Whether it would have been successful under any circumstance is a question. But its chances of success appear to have been effectually destroyed by a blunder for which, though Lawrence was perhaps mainly responsible, the Orleans Company was not altogether blameless. It appears that there had been a previous issue of bonds secured by first mortgage. and, although most of them were under the control, or within reach, of the company, they had not been called in when the attempt was made by Lawrence to float the second issue upon the New York market as first mortgage bonds. The president of the Orleans Company went to New York as soon as he was informed of it and explained the situation as best he could, but it was a mistake that ought not to have occurred; and it had the effect of shaking the confidence of the capitalists, from whom it was hoped that the money might be obtained,

to such an extent that, considering the character of the security offered, we are not persuaded by the evidence before us that anything more could have been done. This being the case, and the material which had been delivered having been placed beyond their reach, and, though wholly unpaid for so far as plaintiffs were concerned, the price received by the Construction Company for the same having been diverted to other uses, we think that plaintiffs' suit and attachment against the Construction Company and its members was fully authorized, and that there was error in the judgment of the court *a qua* dismissing the same as to Costello and Burke and awarding them damages against the plaintiffs. Plaintiffs' contract contemplated that they should be paid half cash and half in the bonds of the Orleans Company at their market value and that, from the proportion due in bonds, there should be deducted the bills for freight, which were to be paid by the Construction Company. This arrangement was predicated upon the assumption that the Construction Company would do the work necessary to entitle it to the bonds and to give those bonds a market value, and as the Construction Company has failed in that respect, through no fault of the plaintiffs, the latter, we think, are entitled to a judgment in money based upon the contract price of the goods actually delivered by them, less the freight charges paid by the Construction Company. The amount of those charges we are unable to ascertain from the record, and we think that justice requires that the rights of the members of the Construction Company with respect thereto should be reserved. For the purposes of the plaintiffs' claim, it is, perhaps, unimportant whether the rails which have been seized belong to the Construction Company or to Costello and Burke, since, although a contracting firm is an ordinary partnership under the law of this State, the Construction Company is a juridical personage the character of whose liability is to be determined, in the absence of proof of a special law in the State of its origin, by the law merchant, and, by that law, the partners are liable *in solido*. Nevertheless, as the question has some bearing in another direction it will be considered.

It appears that the president of the Orleans Company informed Lawrence that the Illinois Central Railroad Company had the rails in question for sale, but if the Orleans Company had any contract, or option, giving it a preference in the matter of the purchase of the rails,

it has not been established. Lawrence bought the rails, at $17.50 per ton, for the Construction Company, and the Illinois Central Railroad Company shipped them to New Orleans, *for delivery when paid for,* retaining the bills of lading in its possession.

Upon June 21st, 1899, Lawrence wrote, from Detroit, to Costello, at Cincinnati, in part, as follows: "I am very feaful of the Ill. Cent. R. R. Co. pulling the rails away  *  *  *  unless we can meet this draft of $12,100 which I had Cliff to draw on us here in order to hold the rails there as long as possible. What I want to know is, whether there is not some way that you can arrange, in Cincinnati, to borrow this sum of money for a short time, and to take the rails as security. We could sell the rails to-day in New Orleans for two or three dollars more a ton than we paid for them. If these rails get away, we cannot replace them short of $22.00 or $23.00 per ton, and then it will take quite a time to get them down there. The idea is simply this: the security is worth a great deal more than the loan which we have to have and everything can be smoothed out if you arrange the matter.  *  *  *  I wish you would telegraph me upon receipt of this, and after conference with Major Burke, and see if there is not some way we can whip the devil around the stump and save these rails. We accepted the draft and it lays at the American Express Co.'s office here awaiting payment next Monday. Kindly consider this letter addressed to Major Burke as well as yourself and let me hear from you."

In response to this appeal, made to him, not as an employe, but, as a member, of the Construction Company, Costello raised $7000.00, which was deposited in the Atlas National Bank, and he and Burke borrowed from that bank, upon a note signed by them and by Mrs. Costello, the further sum of $5200.00, which was needed to make up the amount necessary to pay for the rails, and which was similarly deposited. The draft for the price of the rails, amounting, with interest and charges, to $12,180.44, was then paid by the bank, and the bills of lading for the rails, which, with the rails themselves, were in New Orleans, were turned over to Costello and Burke, who retained possession of them until September 13th, following, more than two months after the rails had been seized in this suit, and then delivered them to the bank in connection with a written act of pledge, which was then executed. There were various transactions between Lawrence and Costello and Burke at that time, which we consider it unnecessary to go into in

detail. Among others, an assignment from the former to the latter, dated June 24th, of the contract with the Orleans Company, which the assignees now repudiate as having been inoperative. Later on, in September, or October, there was another such assignment, which specially included the rails, and which was given the date, June 27th, and is also repudiated. Before the rails were paid for, Costello and Burke inquired, by wire, of the Orleans Company whether, if they made the payment, they would be allowed a lien on the rails. After they were paid for, and had been seized in this case, Costello and Burke executed the act of pledge to the bank, in which it is recited, as showing the character of their interest in the rails, "that the said Costello and Burke having agreed to pay for the same on the pledge or security of said rails and splices and the indorsement and delivery of the bills of lading for the same," etc. Upon the whole, the evidence convinces us that the money to pay for the rails was advanced, so far as Costello and Burke were concerned, for account of the Construction Company, and that, when the payment was made, the title to the property vested in that company, and it does not show that it has ever been devested.

## VI.

The Atlas National Bank alleges, in its intervention, that the rails had been sold by the Illinois Central Railroad Company to the Construction Company and, the latter having failed to pay for them, that they were sold to Costello and Burke, and that, at their request, it, the bank, paid the price, to-wit: $12,180.44, on condition that the bills of lading should be delivered to it, "to be held as security for the repayment of that sum," and that the said bills were assigned, transferred and delivered to it by Costello and Burke to secure the repayment of said advances "whereof there is still due and owing" the sum of $5200.00 and interest. The allegations that the Illinois Central Railroad Company sold the rails to Costello and Burke, and that the bank paid for them on condition that the bills of lading should be delivered to it to secure the whole of the purchase price must have been made in error. The president of the bank testifies that the $5200.00 were advanced to Costello and Burke on condition that it should be used for the payment of the rails and on the further condition that the Illinois Central Railroad Company should turn over to it, or hold, subject to its order, the bills of lading for said rails, which bills of lading were

pledged to it by Costello and Burke to secure the repayment of the money so advanced. He further testifies that "Costello and Burke were authorized to go to New Orleans and receive, for the Atlas National Bank, the bills of lading covering the rails paid for by the advance of $5200.00" and under no circumstances to surrender the bills of lading unless cash in hand was paid for the rails. He further testifies that the original agreement, of June 27th, when the $5200.00 was advanced, was oral, and that it was reduced to writing in September, 1899, when Costello and Burke returned from New Orleans and delivered to the bank the bills of lading, for twenty-seven cars of rails, which they had previously received from the Illinois Central Railroad Company. There is annexed to this testimony the act of pledge in favor of the bank executed by Costello and Burke and dated September 13th, 1899, which, apparently, includes not only bills of lading for the rails but also bills of lading for two cars of special work shipped by the Weir Frog Company to the International Construction Company, and it may be remarked, in this connection, that, although Costello and Burke claim, and testify, that they had no concern with the special work, save as employees of the Construction Company, to which it was consigned, and although they and the bank, claim that the rails were pledged to the latter, nevertheless, it was by their order, alone, that six car-loads of rails and two car-loads of special work which had not been attached, were removed from here to Mississippi, after the other rails had been seized, and the Weir Frog Company obtained judgment against them in that state predicated upon a seizure of the property so removed.

From the facts as presented, we are entirely unable to evolve any pledge in favor of the Atlas National Bank which will affect the rights of the plaintiffs under their attachment. When the $5200.00 was advanced neither the Construction Company nor Costello and Burke were the owners of the rails, nor did they have the rails or the bills of lading in their possession. The rails belonged to the Illinois Central Railroad Company, and it held possession of them, subject to what may be called a past due option in favor of the Construction Company to take them on paying the price. Assuming that Costello and Burke represented the Construction Company, the most that they could do was to promise that the rails should be pledged to the bank. But a promise to pledge gives no privilege on the thing promised. Succession of D'Meza, 26th

Ann. 35. When the price was paid the rails belonged to the Construction Company, of which Costello and Burke were members, and the delivery to them, and their retention, of the bills of lading was not such a delivery as to constitute a pledge in favor of the bank, for they were the debtors and not third persons. Succession of Lanaux, 46th Ann. 1036; C. C. 3162.

Nor did the delivery of the bills to the bank, in September, two months after the rails had been attached, or the written instrument which was then executed, constitute such a pledge, in so far as the attaching creditors were concerned, since the bank cannot be said, at that time, to have acquired the bills as an innocent third holder without notice. We think, however, that, inasmuch as the claim of the bank is not contested by the Construction Company or by Costello and Burke there is no reason, as to them, why it should not be recognized, and, as Costello testifies that the rails are now worth about $30.00 a ton, it may be that the bank will get its money.

## VII.

The Illinois Central Railroad Company claims for demurrage or storage, by reason of the fact that the rails remained on its cars for twenty-nine days after notice to remove them. This claim does not appear to be seriously disputed and is shown to be reasonable. The company is, however, charging for twenty-two cars, when, from the return on the writ of attachment, it seems that only twenty-one cars were included in the seizure. The amount allowed by the district court should, therefore, be reduced from $638.00 to $609.00.

## VIII.

We are unable to find any sufficient legal foundation for the claim of the Orleans and Jefferson Railway Company to the rails. They constituted part of the material that the Construction Company attempted to assemble for the purposes of its contract, but the Orleans Company never acquired any rights in, or to, them, and can no more control the disposition which the Construction Company may choose to make of them than it could have controlled the disposition of the working force of that company. The injunction which was issued at the instance of the Orleans Company, to restrain the Construction Company from

removing the rails, was, therefore, unauthorized; and was properly dissolved by the district court. Upon the other hand, holding, as we do, that Costelo and Burke were not the owners of the rails, they cannot be allowed to recover damages in the matter. Such damages, if any are due, are recoverable, only, by the Construction Company.

For these reasons, it is ordered, adjudged and decreed that the judgment appealed from be affirmed in so far as it rejects the demand of the plaintiffs as against the Orleans and Jefferson Railway Company, Limited, and in so far as it rejects the demands in reconvention, and by way of intervention, of said Orleans and Jefferson Railway Company, Limited, save as to the damages allowed, which are reduced to $250, and that it be affirmed in so far as it condemns the International Construction Company and rejects its demand in reconvention; that it be amended by reducing the amount allowed to the Illinois Central Railroad Company to $609.00, and by holding and decreeing that the Atlas National Bank, of Cincinnati, be paid the amount of its claim, if the fund proves sufficient, from the proceeds of the property attached, after payment of the amounts herein allowed in favor of the Illinois Central Railroad Company and the plaintiffs, respectively; and that said judgment be annulled, avoided and reversed in all other respects. And, proceeding to render such further judgment as should be rendered in the case, it is ordered, adjudged and decreed that there now be judgment in favor of the plaintiffs, Flora B. Cameron, W. W. Cameron, R. H. Downman, and F. A. McDonald, testamentary executors of William Cameron, deceased, and against the defendants, Charles H. Lawrence, E. M. Costello and M. D. Burke, *in solido,* in the full sum of $12,207.38, with legal interest from judicial demand until paid. It is further ordered and adjudged that the writ of attachment herein issued be maintained and that the amount of this judgment, in favor of the plaintiffs, be paid from the proceeds of the property attached in preference to any other claims save that of the Illinois Central Railroad Company as herein recognized and allowed, subject, however, to the condition that the right is reserved to the defendants, or either of them, to have the amount for which this judgment is rendered reduced by the amount that they, or the International Construction Company, may have paid as freight upon the ties and other material shipped by the plaintiffs to said company under the contract sued on. It is further ordered, adjudged and decreed that the demands set up by said E. M.

Costello and M. D. Burke and by Costello & Burke by way of recon-vention and intervention be rejected. It is further ordered and adjudged that, for all the purposes of this suit, the property attached be held to belong to the International Construction Company, composed of Charles H. Lawrence, E. M. Costello and M. D. Burke, but that the rights of the said parties *inter sese* with respect to the same, and as members of said company, be reserved. It is further ordered and adjudged that the costs of the lower court be paid by the International Construction Company and by Costello and Burke save those incurred by reason of the intervention of the Orleans and Jefferson Railway Company which shall be paid by that company, and that the costs of the appeal be paid by Costello and Burke, the Orleans and Jefferson Railway Company, the Atlas National Bank, of Cincinnati, and the Illinois Central Railroad Company.

Rehearing refused.